UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TRUSTEES OF THE PLUMBERS LOCAL UNION NO. 1
WELFARE FUND, ADDITIONAL SECURITY BENEFIT
FUND, VACATION & HOLIDAY FUND, TRADE
EDUCATION FUND, 401(K) SAVINGS PLAN,
TRUSTEES OF THE PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND,
TRUSTEES OF THE INTERNATIONAL TRAINING
FUND,

                        Plaintiffs,

      -against-

ENOBRAC PLUMBING INC.,
ENOBRAC MECHANICAL INC.,

                      Defendants.
------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
17-CV-2846-DLI-SJB

**BULSARA, United States Magistrate Judge:**

      Plaintiffs are the trustees of various labor management trust funds, namely the

Plumbers Local Union No. 1 Welfare Fund, the Additional Security Benefit Fund, the

Vacation & Holiday Fund, the Trade Education Fund, and the 401(k) Savings Plan (the

"Local 1 Funds"); the Plumbers & Pipefitters National Pension Fund ("NPF"); and the

International Training Fund ("ITF") (collectively the "Funds").[1]  They filed the present

action against Defendants ENOBRAC Plumbing Inc. and ENOBRAC Mechanical Inc.

(collectively "Enobrac") to collect delinquent contributions allegedly owed to the Funds.

The Fund Trustees have brought claims pursuant to sections 502(a)(3) and 515 of the

Employee Retirement Income Security Act, as amended, 29 U.S.C. §§ 1132(a)(3), 1145

("ERISA") and also seek a declaratory judgment, pursuant to 28 U.S.C. §§ 2201-02.

---

[1] Plaintiffs, the trustees of the Local 1 Funds, NPF and ITF, are collectively
referred to herein as "the Fund Trustees."

On June 15, 2017, Enobrac filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim as a matter of law, Rule 9(b) for failing to plead fraud with particularity, and Rule 12(b)(7) for failure to join a party as required under Rule 19. On October 16, 2017, the motion was referred by the Honorable Dora L. Irizarry to the Honorable Robert M. Levy for a report and recommendation.  On October 17, 2017, the case was transferred to the undersigned.

The Complaint alleges that Enobrac is an alter ego of MJM Plumbing, Inc. ("MJM"), an entity that is party to a collective bargaining agreement ("CBA") with the Fund Trustees.[2]  The Fund Trustees initiated two prior lawsuits seeking to hold MJM responsible for the same employee contributions that are the subject of the present lawsuit; those lawsuits resulted in two settlement agreements and consent judgments entered in favor of the Funds.  After the last settlement agreement and consent judgment, MJM and its principal, Michael A. Carbone ("Carbone Sr."), both filed for bankruptcy.  The Fund Trustees have filed proofs of claims in both bankruptcy proceedings seeking recovery of the contributions that are the subject of the settlement agreements and the past and present lawsuits.

Neither party has addressed the issue at the heart of the case: whether this litigation can proceed in light of MJM and Carbone Sr.'s ongoing bankruptcy proceedings.  Plaintiffs fail to mention, either in the Complaint, or the opposition to the

---

[2] The Complaint refers to a single CBA ("the CBA").  The complaint in the 2012 lawsuit, discussed *infra*, refers to "CBAs," while the 2014 complaint refers to both CBAs (in the facts section) and "the CBA" (in the causes of action).  The Funds have not submitted to the Court the CBA or CBAs either in this action, or it appears, in any other action.

motion to dismiss, that they filed proofs of claim bankruptcy court or that they seek recovery of the same contributions in that forum that they seek in this Court.

In addition, the Funds allege Enobrac is an alter ego of or the same entity as MJM.  If that is true, then the Funds are seeking to recover assets from Enobrac that belong to MJM.  Under settled principles of bankruptcy law, the Fund Trustees cannot jump the line and make claims on the debtor's assets ahead of other creditors.  If Enobrac does have assets that belong to MJM, the Fund Trustees lack standing to obtain them: only the bankruptcy trustee may obtain from third parties assets that are legitimately the debtor's.

Moreover, while the Fund Trustees repeatedly acknowledge the existence of the automatic bankruptcy stay protecting MJM, they give no explanation why a lawsuit alleging that Enobrac is one and the same as MJM can proceed in the face of that stay.[3] This lawsuit is nothing more than a thinly veiled attempt to avoid the bankruptcy stay. A party must first seek leave of the bankruptcy court before initiating litigation "against the debtor" or to "recover a claim against the debtor."  This is such a lawsuit.  A lawsuit filed in violation of the automatic bankruptcy stay is, as the Second Circuit has explained, *void*.[4]

The Court has been forced to address the issues of Plaintiffs' standing and the automatic bankruptcy stay on its own initiative.  The parties' papers allude to these issues only in the most tangential way, if at all.  And as detailed below, many material

---

[3] Though the Fund Trustees mention the MJM bankruptcy, they say nothing about the bankruptcy stay in Carbone Sr.'s case.

[4] Defendants, for their part, while citing to the existence of the MJM bankruptcy petition, do not address the impact of the bankruptcy proceedings on the lawsuit or their motion to dismiss.

aspects of the bankruptcy proceedings—including that the Fund Trustees filed proofs of claim for the contributions that they are now seeking in this litigation—were never brought to the Court's attention, despite their obvious relevance to this case.[5]

Regardless, standing implicates this Court's subject matter jurisdiction, which a court may address at any time on its own motion. *In re Tronox Inc.*, 855 F.3d 84, 95 (2d Cir. 2017) ("[F]ederal courts have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*.") (citations and quotations omitted). And "if subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action sua sponte." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009). Some courts have suggested that the applicability of the automatic bankruptcy stay also is an issue of subject matter jurisdiction. *See Victor v. Riklis*, No. 91-CV-2897, 1992 WL 122911, at *3 (S.D.N.Y. May 15, 1992). But in any event, the applicability of a bankruptcy stay may also be raised *sua sponte*. *E.g.*, *Myers v. Da Silva*, No. S-81-854, 1983 WL 1300, at *1 (E.D. Cal. Mar. 14, 1983).[6]

---

[5] To the extent that there is any requirement that the parties be heard on the issues being raised *sua sponte*, the ability to object to this Report and Recommendation satisfies any such requirement. *See Heckmann v. Town of Hempstead*, No. 10-CV-5455, 2012 WL 1031503, at *6 (E.D.N.Y. Feb. 24, 2012), *report and recommendation adopted*, No. 10-CV-5455, 2012 WL 1032776 (Mar. 27, 2012).

[6] Neither party raises another subject matter jurisdiction question: *i.e.*, whether the Complaint alleges ERISA violations by Enobrac itself such that federal jurisdiction exists. *See Ellis v. All Steel Const. Inc.*, 389 F.3d 1031, 1039 (10th Cir. 2004) ("No separate federal jurisdiction[al] basis is needed when ERISA liability is asserted *directly* against a second entity based upon that second entity's direct role in the ERISA violation . . . regardless of whether ERISA liability is asserted upon the basis of an alter-ego or veil-piercing theory. . . . [No jurisdiction exists when] liability is asserted only derivatively or vicariously against the second entity based solely upon the relationship between the second entity and the initial ERISA employer.") (emphasis in original). Had the Fund Trustees asserted only a successor theory of liability, then the Court

For the reasons explained below, the Court respectfully recommends that:

1. The Complaint be dismissed because the Fund Trustees lack standing;

2. In the alternative, the lawsuit be dismissed because the Fund Trustees have violated the automatic bankruptcy stay;

3. In the alternative, the lawsuit be dismissed as duplicative;

4. Defendants' motion be dismissed as moot; and

5. Any opinion resolving any objections to this Report and Recommendation be forwarded to the bankruptcy court.

I.   Factual and Procedural History

The following facts are drawn from the Complaint and elsewhere, as noted:

A.   The Parties

Local Union No. 1 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (the "Union") is a labor organization that represents employees, and is the certified bargaining representative for employees of MJM.  (Compl. ¶ 4).[7]  Carbone Sr. is MJM's principal owner and officer, (12-CV-653 Second Am. Compl., Dk. No. 19, ¶¶ 7-8), and MJM has maintained an office at 268 West Street, New York, 10013.  (*Id.* ¶ 6).  The New York Department of State website lists Carbone Sr. as Chief Executive Officer, and provides the West Street address as for the location of its principal executive office.  NYS

---

would conclude that there is no federal jurisdiction.  The theories of alter ego and single employer, the facts alleged in the Complaint, and the fact that Plaintiffs seek an audit and contributions directly from Enobrac (Counts II and III), could be a basis to argue there are direct claims against Enobrac, not simply derivative ones.  But it is unnecessary to reach the question, in light of the other bases to dismiss the complaint or declare it void.

[7] Unless otherwise noted, citations to the Complaint (Compl.) are to the pleading filed in this case, not the two prior litigations.

Department of State, Division of Corporations, Entity Information, *available at*
goo.gl/2EqSfa (last visited Feb. 8, 2018, 4:26 PM).

MJM has entered into CBAs with the Union.  (12-CV-653 Second Am. Compl. ¶
11).  These CBAs require MJM to make certain benefit contributions to the Local 1
Funds.  (*Id*. ¶ 12; Compl. ¶ 11).  MJM is an employer within the meaning of section 3(5)
and 515 of ERISA.  (12-CV-653 Second Am. Compl. ¶ 6).

Plumbers Local Union No. 1 Welfare Fund ("the Welfare Fund") is the designated
collection agent for the Union under the CBAs.  (12-CV-653 Second Am. Compl. ¶ 12;
Compl. ¶ 5).  Among other things, the CBAs require that MJM remit Union dues to the
Welfare Fund.  (12-CV-653 Second Am. Compl. ¶ 12).

Plumbers and Pipefitters National Pension Fund (NPF) and International
Training Fund (ITF) are also pension benefit and welfare benefit plans, respectively.
NPF and ITF are established and maintained by a trust agreement between various
employers within the plumbing industry and the United Association of Journeymen and
Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada.
(Compl. ¶¶ 6-7).

Defendants Enobrac are two corporations that are employers within the meaning
of sections 3(5) and 515 of ERISA.  (Compl. ¶ 8).  Enobrac Mechanical Inc.'s "Principal
Executive Office" on the website of the New York Department of State is 9 Mount Rainer
Avenue Farmingville, New York 11738, and it lists John Carbone as Chief Executive
Officer, with an address of 295 Greenwich Street Suite 179 New York, New York 10007.
NYS Department of State, Division of Corporations, Entity Information, *available at*
goo.gl/BbFa6q (last visited Feb. 8, 2018, 4:31 PM).  Enobrac Plumbing Inc.'s entry with
the Department of State only provides an address at which it will receive service of

6

process, and lists the Greenwich Street address for that purpose.  NYS Department of State, Division of Corporations, Entity Information, *available at* goo.gl/N4qMQX (last visited Feb. 8, 2018, 4:26 PM).

> B. The 2012 Lawsuit

On February 9, 2012 the trustees of the Local 1 Funds ("the Local 1 Trustees") filed a complaint against MJM and Carbone Sr. in a case before the Honorable Sterling Johnson, Jr.  (*See* 12-CV-653 (E.D.N.Y. Feb. 9, 2012)).  The Local 1 Trustees brought claims to "enforce [MJM and Carbone Sr.'s] contractual and statutory obligations to make specified monetary contributions to [the Funds]."  (12-CV-653 Second Am. Compl. ¶ 1).  They alleged that MJM was required under various CBAs entered into with the Union to make contributions to the Local 1 Funds.  (*Id.* ¶ 12).

The Second Amended Complaint contained five causes of action: the first alleged MJM violated section 515 of ERISA (29 U.S.C. § 1145), the CBAs, and "the documents and instruments governing the Local 1 Funds," by failing to make $66,989 in contributions (12-CV-653 Second Am. Compl. ¶¶ 21-22), for work performed during July and August 2012.  (*Id.* ¶ 13).  The second alleged MJM violated the CBAs, and the "trust agreements and collection policies" promulgated pursuant to the CBAs, by failing to make timely payments prior to June 2012, and sought $14,357 in interest.  (*Id.* ¶¶ 14, 24).  The third also alleged a failure by MJM under the CBAs, and the "trust agreements and collection policies promulgated" pursuant to the CBAs, to make timely payments prior to June 2012 and sought $129,736 in liquidated damages.  (*Id.* ¶¶ 15, 26).  The fourth cause of action sought recovery of $3760 in attorney's fees expended in collecting contributions that were made late from January 2009 to October 2011, (12-CV-653 Second Am. Compl. ¶ 16).  The fifth cause of action was brought against Carbone Sr. and

alleged that he exercised operational control of MJM, was directly responsible for the failure to make the benefit contributions, in violation of ERISA and the CBAs (*Id.* ¶¶ 29-41), and sought recovery of the contributions from him in his personal capacity. (*Id.* ¶¶ 42-46). Counsel for the Local 1 Trustees in the case was Virginia & Ambinder, LLP. (12-CV-653 Second Am. Compl. at 1).

In March 2013, the Local 1 Trustees entered into a settlement agreement with MJM and Carbone Sr. (12-CV-653, Settlement Agreement, Dkt. No. 24 at 1). MJM agreed to pay the Local 1 Trustees $29,587.85, interest of $19,268.17, and attorney's fees of $10,319.68 on a monthly schedule beginning in April and ending in December 2013. (*Id.* ¶ 1). The settlement agreement did not resolve the Local 1 Funds' claims for contributions, interest, and liquidated damages for the period beginning October 2009; those claims were reserved for future resolution. (*Id.* ¶ 6). The agreement was executed by John J. Murphy, on behalf of the Local 1 Trustees, Carbone Sr. on behalf of MJM, and by Carbone Sr. individually. (*Id.* at 4-5). The agreement is "binding upon" and "inure[s] to the benefit of" the parties, their officers, trustees, and directors, as well as their "successors." (*Id.* ¶ 9).

The parties also executed a Consent Judgment that was entered by the Court. (12-CV-653, Consent Judgment, Dkt. No. 25). The Consent Judgment was entered in favor of the Local 1 Trustees, and against MJM, for $39,587.85. (*Id.* ¶ 1). The Consent Judgment was signed by the same individuals who signed the Settlement. (*Id.* ¶ 2-4). This case was closed on April 3, 2013, following entry of the Consent Judgment and the dismissal of the action against Carbone Sr. (*See* Dkt. Nos. 25, 27).

### C.  The 2014 Lawsuit

On October 28, 2014 the Fund Trustees, on behalf of all the Funds, filed a second

lawsuit against MJM and Carbone Sr.  The case was assigned to the Honorable Denis R. Hurley.  (*See* No. 14-CV-6342 (E.D.N.Y. Oct. 28, 2014), Dkt. No. 1).  The Fund Trustees brought claims to "enforce [MJM and Carbone Sr.'s] contractual and statutory obligations to make specified monetary contributions to [the Funds]."  (14-CV-6342 Compl. ¶ 1).

The first cause of action sought $556,340.10 from MJM in contributions for work performed from October 2009 through September 2014 pursuant to the CBA, the documents and instruments governing the Funds, and ERISA.  (14-CV-6342 Compl. ¶¶ 20-24).  The second sought from MJM $145,423.77 in contributions owed to NPF and ITF for work performed from October 2009 through September 2014, pursuant to the CBA and ERISA.  (*Id.* ¶¶ 27, 28).  The third sought to hold Carbone Sr. responsible under ERISA for the $556,340.10 owed to the Local 1 Funds.  (*Id.* ¶¶ 38-42).  The fourth sought to hold Carbone Sr. responsible under ERISA for the $145,423.77 in contributions owed to NPF and ITF.  (*Id.* ¶¶ 43-56).  Counsel for the Fund Trustees was again Virginia & Ambinder, LLP.  (*Id.* at 1).

On February 17, 2015, the parties executed a Stipulation of Settlement.  (No. 14-CV-6342, Dkt. No. 6) (the "2015 Settlement").  Under the agreement, MJM agreed to pay to the Funds a total of $647,918.06.  (*Id.* ¶ 1).  That amount was made up of contributions owed from the period October 2009 to December 2011 and January 2013 to December 2014 to INF, plus interest, audit costs, and attorney's fees; contributions owed to the Local 1 Funds for the period November to December 2014, plus interest, audit costs, and attorney's fees; and contributions and interest owed to the 401(k) Savings Plan.  (*Id.*)  MJM was to make payments on a monthly basis, ending on September 1, 2016.  (*Id.* ¶ 2).  If MJM defaulted on any payment, the unpaid amounts

due would accelerate, and MJM would be immediately liable for the unpaid amount, plus unpaid interest, attorney's fees and costs, as well as additional liquidated damages of $243,818.19 that plaintiffs had previously waived.  (*Id.* ¶ 6).

The 2015 Settlement is "binding upon" and "inure[s]" to the parties, their trustees, officers, directors, and "successors."  (*Id.* ¶ 12).  It provided that "[j]urisdiction is retained [ ] to enforce compliance with the terms of the" settlement and any consent judgment.  (*Id.* ¶ 13).  The 2015 Settlement was signed by three trustees, one on behalf of each of the Funds or Fund groups, and MJM (by Carbone Sr.).  (*Id.* at 5).  On April 21, 2015, Judge Hurley so ordered the 2015 Settlement and restated that the Court would retain jurisdiction to enforce the agreement, and in the event of default, the Fund Trustees could reopen the case.  (14-CV-6342, Minute Entry dated April 21, 2015).

On June 16, 2015, the Fund Trustees filed a motion to have judgment entered against MJM and Carbone Sr.  (14-CV-6342, Dkt. No. 9).  The motion included an executed Consent Judgment that provided for a judgment in the amount of $891,736.25 in favor of the Funds and against MJM.  (14-CV-6342, Dkt. No. 10, Declaration of Elina Burke ("Burke Decl.") dated June 12, 2015, Ex. A).  As of June 12, 2015, MJM had paid $73,773.23 due under 2015 Settlement, but failed to make payments for March, April or May 2015.  (Burke Decl. ¶¶ 8-9).  As a result of that default, MJM's payment obligations under the 2015 Settlement accelerated, and it became liable for fees and previously waived liquidated damages obligations.  (*Id.* ¶¶ 10-13).  The Fund Trustees sought, therefore, a judgment of $819,163.02, which reflected the amount owed then by MJM. (*Id.* ¶¶ 14-15 (mislabeled as ¶ 12)).  On October 5, 2015, Judge Hurley entered judgment against MJM in that amount.  (14-CV-634, Dkt Nos. 12-13).

D.   The MJM Bankruptcy

On November 1, 2016, MJM filed a Chapter 11 petition bankruptcy petition in the Eastern District of New York.  (*In re MJM Plumbing of NY, Inc.*, 16-44924 (Bankr. E.D.N.Y., Nov. 1, 2016), Dkt. No. 1).  In that petition, which was signed by Carbone Sr., MJM listed the Local 1 Funds and NPF as unsecured creditors.  (*Id.* at Schedule Form 204; *see* also Dkt. No. 16 ("Form 202") at 1, 7).  MJM also indicated that the case before Judge Hurley, 14-CV-6342, was a legal action it was involved in the year prior to the bankruptcy filing.  (*Id.* ("Form 207") at 2).  MJM indicated the case was "pending." (*Id.*).  The filing also indicated Carbone Sr. was a 100% owner of MJM.  (*Id.* ("List of Equity Security Holders") at 1).  The bankruptcy was converted to a Chapter 7 proceeding on February 11, 2017.  (16-44924, Dkt. No. 27).

The bankruptcy court set August 1, 2017 as the administrative bar date, *i.e.* the deadline for all creditors to file claims against MJM's estate.  (16-44924, Dkt. No. 55 (June 11, 2017)).  On May 22, 2017, the Local 1 Funds filed a claim for $848,795.89.  (16-44924, Claim 14-1 at 1).  The basis for the claim was listed as "contributions to employee benefit plans pursuant to [the] CBA."  (*Id.* at 2).  The $848,795.89 was alleged to be a "prepetition claim" for liabilities incurred from October 2009 to October 2016 for unpaid contributions, interest, liquidated damages, audit fees and attorney's fees.  (*Id. at* 4).  The same day NPF also filed a claim for $120,005.91 the basis of which was also "contributions to employee benefit plans pursuant to [the] CBA."  (16-44924, Claim 16-1, at 1).  The schedule attached to the claim indicated that of that amount "$69,211.87" due under a "Stipulation of Settlement."  (*Id.* at 5).  Both claims were filed by the same counsel, Virginia & Ambinder, LLP.

A trustee has been appointed in the MJM bankruptcy (16-44924, Dkt. No. 29)

who has initiated several adversary proceedings to obtain property that allegedly belongs to the debtor's estate. (16-44924, Dkt. Nos. 58-64); (*e.g.*, 17-1135, Dkt. No. 1 (Compl.) at 7-8).

      E.    The Carbone Sr. Bankruptcy

On November 17, 2016, Carbone Sr. also filed a Chapter 11 petition bankruptcy petition in the Eastern District of New York. (16-45189 (Bankr. E.D.N.Y., Nov. 17, 2016), Dkt. No. 1). In the petition, Carbone Sr. lists MJM's bankruptcy as an affiliated case. (*Id.* at 3). Carbone Sr. also lists the Local 1 Welfare Fund as a creditor. (*Id.* at 9).

The bankruptcy court set March 20, 2017 as the administrative bar date, *i.e.* the deadline for all creditors to file claims against Carbone Sr.'s estate. (16-45189, Dkt. No. 18). On March 18, 2017, the Local 1 Funds filed a claim for $476,408.43 through the same firm that filed the past and present lawsuits. (16-45189, Claim 9-1). The claim contained a rider with allegations about MJM's obligations to make contributions to the Local 1 Funds, and stated "[i]n connection with [work] . . . performed from October 2009 through October 2016, MJM failed to remit required contributions to the Funds in the principal amount of at least $400,849.78," consisting of various amounts due during the periods October 2009 to December 2011, November 2013 to December 2014, and February through October 2016, plus other nominal amounts. (*Id.* ¶¶ 6-8). The rider alleges that Carbone Sr. was "directly responsible" for MJM's failure to make contributions to the Funds, and is personally liable as an ERISA fiduciary. (*Id.* ¶¶ 12-14; 22). On March 18, 2017, NPF also filed a claim on its own behalf and as a collection agent for ITF for $112,045.84, through the same counsel. (16-45189, Claim 10-1). This claim contains a rider with identical allegations as in the rider filed by Local 1 Funds, except that NPF seeks a recovery of $93,351.70 for work performed from June 2014 to

October 2016.  (*Id.*, Rider ¶ 8).

On June 15, 2017, Carbone Sr. filed a disclosure statement in support of a proposed plan of reorganization.  (16-45189, Dkt. No. 30).  In the statement, he states that "[t]he Debtor's bankruptcy filing was precipitated by financial difficulties of . . . MJM . . . including tax and union debts."  (*Id.* at 4).  The disclosure statement lists as liabilities both priority ($130,141.23 and $33,477.66) and unsecured ($346,267.20) claims of the Local 1 Funds, NPF and ITF.  (*Id.* at 7).  The plan proposes to pay NPF and ITF claims in full over a period of 60 months.  (*Id.* at 13).  It also indicates that it cannot pay the amounts owed in satisfaction of the Local 1 Funds priority claims in full, and their claims be paid via a proposed settlement.  (*Id.* at 14-15).  All unsecured creditor claims, including those of the Local 1 Funds, are to be paid on a monthly basis up to an aggregate amount of $50,000.  (*Id.*).

The Funds filed an objection to Carbone Sr.'s proposed plan of reorganization. (16-45189, Dkt. No. 47).  Carbone Sr. filed a motion to expunge, reduce and/or reclassify the Funds' claims on the basis that the Funds failed to present sufficient evidence.  (Dkt. No. 48).  The Funds responded on December 18, 2017.  (Dkt. No. 94).  A hearing is currently scheduled before Judge Lord on March 8, 2018.

F.    The Present Lawsuit

The Fund Trustees filed the present action on May 10, 2017, some 12 days before filing proofs of claim in the MJM bankruptcy, and about two months after filing proofs of claim in the Carbone Sr. bankruptcy.

The Complaint alleges that MJM—who has not been named as a defendant—is a party to a CBA that required MJM to make contributions to the Fund Trustees.  (Compl. ¶ 11).  According to the Fund Trustees, Enobrac and MJM are "alter egos" and

"successors" of "each other." (*Id.* ¶ 14). They each have "identical management, business purpose, operation, equipment, customers, supervision, and ownership." (*Id.*). "[N]otwithstanding any nominal separation between them" Enobrac is a "single integrated enterprise with MJM and each other." (*Id.* ¶ 15). They have "interdependent operations, common management, centralized control of labor functions, common and/or family ownership" and "shared facilities and equipment." (*Id.*). Enobrac allegedly operates out of the same premises, shares insurance policies, and uses the same personnel, equipment, vehicles, and facilities as MJM. (*Id.* ¶¶ 19-22). Enobrac and MJM employ the same workers, "without any meaningful distinction in their operations," who worked on the same plumbing jobs. (*Id.* ¶¶ 23-25).

Enobrac and MJM allegedly "failed to follow ordinary corporate formalities," to "keep separate records," or to have an arm's length relationship. (*Id.* ¶ 26). The Fund Trustees allege that Enobrac was created "for the purpose of perpetrating a fraud against the Funds," including to avoid the obligations MJM has under the CBA. (*Id.* ¶ 27).

The Complaint contains three causes of action. The first seeks a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 & 2202 that Enobrac is an alter ego and successor and/or a single employer of MJM, is bound by the CBA, and jointly and severally liable for MJM's "unpaid contributions for work performed by their employees under the CBA." (*Id.* ¶ 34).[8] The second seeks an order pursuant to ERISA directing Enobrac to submit to an audit, by the Funds, of their books and records for the period

---

[8] This report and recommendation refers to alter ego, single employer, and successor liability either as remedies or theories, not claims or causes of action. Each of these three veil-piercing theories is pleaded to support the Fund Trustees' claims for a declaratory judgment, audit, and for ERISA contributions.

May 2011 to the present.  (*Id.* ¶ 40).  The third seeks to hold Enobrac liable under ERISA for MJM's contributions to the Funds due under the CBA for the period May 2011 to the present.  (*Id.* ¶¶ 42-46).

Discussion

I.   <u>Standing</u>

Standing is a "'threshold question in every federal case'" and determines "'the power of the court to entertain the suit.'" *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 66 (2d Cir. 2013) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)).  A core principle in the standing inquiry and the one relevant to this litigation is the general bar on "third-party standing."  That is, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499; *Madoff*, 721 F.3d at 58.

In the bankruptcy context, the question of standing arises "when individual creditors sue to recover funds from third parties to satisfy amounts owed to them by the debtor," and is "based on the suing creditors' need to demonstrate an injury *other* than one redressable under the [Bankruptcy] Code only by the trustee."  *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 108 n.3 (2d Cir. 2016) (emphasis added).  That is, the trustee has exclusive authority to initiate lawsuits on behalf of the estate.  And creditors do not have authority, and thus no standing, to bring lawsuits that are properly brought by a bankruptcy trustee.

A trustee may not "collect money owed to creditors."  *Madoff*, 721 F.3d at 67; *see also Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991).  The Second Circuit explained that the corollary is true as well: "only a trustee, not creditors, may assert claims that belong to the bankrupt estate."  *Madoff*, 721 F.3d at 71.  But

15

whether a trustee is collecting "money owed to creditors," as opposed to money "owed to the estate," is not determined by whether a creditor shares in the recovery. Nor is it determined by whether a creditor's claim would ultimately be paid by the estate's recovery. Rather, it is determined by whether the claim is based on a derivative (sometimes called general) or direct (sometimes called specific) interest.

Derivative interest in a claim against a third party is one in which the creditor indirectly benefits. *Madoff*, 721 F.3d at 71. "A claim based on rights 'derivative' of, or 'derived' from, the debtor's typically involves property of the estate." *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 88 (2d Cir. 2014). The debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), including "'causes of action possessed by the debtor at the time of filing.'" *Madoff*, 740 F.3d at 88 (quoting *Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir. 2010)); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 n.3 (2d Cir. 1989) ("[C]auses of action that could be asserted by the debtor are property of the estate and should be asserted by the trustee.").

"A trustee . . . has authority to investigate the circumstances surrounding the insolvency and to recover and distribute any remaining funds to creditors." *Madoff*, 721 F.3d at 59. For example, a trustee can sue an entity that allegedly defrauded the debtor corporation. *See, e.g.*, *In re Sunshine Precious Metals, Inc.*, 157 B.R. 159, 161-2 (Bankr. D. Idaho 1993) (holding that although creditors of Chapter 11 debtor had an interest in the claim against debtor's parent corporation, which allegedly fraudulently transferred assets to itself, the claim was derivative and creditors lacked standing). In such a case, although any single creditor can argue it too was harmed by the fraud, so can any other creditor. Should the trustee prevail, the recovery would increase the assets available to

the estate and pay all creditors.  This kind of "derivative" interest is also referred to as a "common" or "general" claim.  *Madoff*, 721 F.3d at 71 ("A debtor's claim against a third party is 'general' if it seeks to augment the fund of customer property and thus affects all creditors in the same way.").

In contrast, a direct claim against a third party is one in which other creditors and the debtor have no interest; it is a specific to the suing creditor only.  Such a claim is "personal to the individual creditor and of no interest to the others."  *Tronox*, 855 F.3d at 100.

Derivative or indirect claims against a third party can only be asserted by the trustee; direct or personal claims against a third party cannot be asserted by the trustee, and only by the creditor.  *See Steinberg v. Buczynski,* 40 F.3d 890, 893 (7th Cir. 1994).  Put another way, "'when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so.'"  *Madoff*, 740 F.3d at 88 (quoting *Hirsch v. Arthur Andersen Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995)).

The question in this case is whether the Fund Trustees are asserting derivative (general) claims for which they have no standing, or direct (personal) claims, against Enobrac.  That inquiry proceeds in two steps.  *First*, there is the threshold question of what law applies to whether the Fund Trustees' claims can be brought by a bankruptcy trustee or a creditor outside of the bankruptcy proceeding.  *Second*, is the question of whether such claims are general as opposed to specific.  If the claims asserted by the Fund Trustees are general, they are property of the debtor, MJM or Carbone Sr., and the Fund Trustees do not have standing to assert them.

A.  Applicable Law

The Fund Trustees have asserted three claims (for a declaratory judgment; an audit of Enobrac; and for Enobrac to satisfy joint ERISA obligations it allegedly has with MJM under the CBA).  Those claims are themselves predicated on three theories of liability (alter ego, successor, and single employer) that are a form of corporate veil piercing.  (*See* Compl. ¶ 34 (Declaratory Judgment Claim) (seeking declaration that Enobrac is an "alter ego[] and successor[] and/or constitute a single employer of MJM and each other"); ¶ 39 (Audit) ("By virtue of their status as alter egos and successors of MJM and each other and/or as a single employer of MJM and each other, Defendants are and have all times been bound by the CBA."); ¶ 40 ("Accordingly, pursuant to [ERISA] . . . [Fund Trustees] are entitled to an order directing [Enobrac] to submit to an audit."); ¶ 45 (Delinquent Contributions) (making same alter ego, successor, and single employer allegation); ¶ 46 ("Accordingly, pursuant to [ERISA], [and] the CBA, [Enobrac] . . . is jointly and severally liable to the Funds for delinquent contributions.").

The boundaries of the alter ego, successor and single employer remedies are normally a question of state law.  *E.g.*, *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).  The Fund Trustees, however, are using those doctrines to support ERISA and declaratory judgment claims, *i.e.* a federal cause of action.  As such, federal common law—not state law—governs the veil piercing theory.  *Ferrara v. Oakfield Leasing Inc.,* 904 F. Supp. 2d 249, 269 (E.D.N.Y. 2012) ("The great weight of authority in this Circuit holds that federal common law, not state law, is controlling when evaluating liability in ERISA actions.") (collecting cases).  "[P]iercing a corporate veil in an action arising under ERISA is a question of federal

substantive law, though state law may be used as a reference guide." *Id.* at 270

(citations and quotations omitted).

Whether a claim may be brought by a trustee or a creditor outside of the

bankruptcy proceeding also typically depends on state law. *St. Paul*, 884 F.2d at 700.

That is because the claims being asserted by the trustee or creditor are often state law

claims. *Agri-Best Holdings, LLC v. Atlanta Cattle Exch., Inc.*, 812 F. Supp. 2d 898, 901

(N.D. Ill. 2011) ("'[W]hether a claim may be brought by a creditor of a bankrupt

corporation outside of the bankruptcy proceedings depends on an analysis of state

law'—at least where . . . the claim arises from state law.") (quoting *St. Paul*, 884 F.2d at

688).  Here, however, the Court is faced with federal causes of action (*i.e.* for a

declaratory judgment and under ERISA) supported by veil piercing theories defined by

federal common law.  Consequently, federal law determines whether a bankruptcy

trustee or creditor may, outside of bankruptcy, pursue alter ego, successor and single

employer-based ERISA claims. *See Maney v. Fischer*, No. 96-CV-0561, 1998 WL

151023, at *1 (S.D.N.Y. Mar. 31, 1998) (adopting report and recommendation); *Holcomb

v. Pilot Freight Carriers, Inc.*, 120 B.R. 35, 43 (M.D.N.C. 1990) (analyzing federal

common law on alter ego doctrine to determine if trustee may bring federal WARN Act

claim).[9]

---

[9] Some courts have used state law to determine whether a trustee or creditor may bring an ERISA claim predicated on an alter ego theory. *See, e.g.*, *Nieto v. Unitron,* No. 06-11966, 2006 WL 2255435, at *5 (E.D. Mich. Aug. 7, 2006).  The Court believes such cases to be in error.

B. <u>Plaintiff's Derivative (General) or Direct (Specific) Interest</u>

Turning to the second inquiry, the Court assesses whether the claims in the Complaint are derivative (general) or direct (specific). To do so, the Court must "inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted." *Madoff*, 740 F.3d at 89. Substance, rather than the labels of the claims, is the focus of the Court's inquiry. *Id.* at 91-92. Furthermore, "the analysis of whether a claim is personal or general is not dependent on whether the claim is an ERISA claim." *Labarbera v. United Crane & Rigging Servs., Inc.*, No. 08-CV-3274, 2011 WL 1303146, at *6 (E.D.N.Y. Mar. 2, 2011). "The relevant question is whether Plaintiffs' alter ego or successorship claims could be made by other creditors, which requires an examination of the allegations supporting the claims." *Id.*

In ERISA cases "there is 'a federal interest supporting disregard of the corporate form to impose liability.'" *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) (quoting *Lumpkin v. Envirodyne Indus., Inc.*, 993 F.2d 449, 460-61 (7th Cir. 1991)); *see also N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005)).[10] The three veil piercing theories (alter ego; single employer; and successor liability) bear this out.

"The alter ego doctrine is designed to defeat attempts to avoid a company's union obligations through a sham transaction or technical change in operations." *Local One*

---

[10] "[T]he fact that courts tend to accord less deference to the corporate form in ERISA cases than required under the state alter ego doctrines does not establish plaintiffs' standing to bring their alter ego cause of action outside the bankruptcy proceedings." *Maney*, 1998 WL 151023, at *2.

*Amalgamated Lithographers of Am. v. Stearns & Beale, Inc.,* 812 F.2d 763, 772 (2d Cir. 1987).  The doctrine is a "hook to bind a non-signatory to a collective bargaining agreement."  *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (citations and quotations omitted).[11]

The doctrines of single employer and successor liability operate similarly.  "The single employer doctrine is an exception to the doctrine of limited liability in corporate law, which allows corporate entities to escape liability for the acts of a separate, [but] related entity[.]"  *Ferrara*, 904 F. Supp. 2d at 260.  Under the doctrine, two separate companies are jointly and severally liable under a collective bargaining agreement signed by only one if both are part of a "single integrated enterprise."  *Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 747-8 (2d Cir. 1996) (holding that two companies acting as a single employer "is enough to hold them jointly and severally liable for each other's debts and obligations, including financial obligations under [a] collective bargaining agreement"); *Ferrara*, 904 F. Supp. 2d at 260 ("Under the single employer doctrine, two nominally distinct enterprises will be joint and severally liable under the CBA signed by only one when the two act as a single integrated enterprise.") (citations and

---

[11] "'The test of alter ego status is flexible,' allowing courts to 'weigh the circumstances of the individual case,' while recognizing the following factors are important: 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership.'" *Ret. Plan of UNITE HERE*, 629 F.3d at 288 (quoting *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984).

quotations omitted); *Labarbera v. Cretty Enters., Inc.*, Nos. 03-CV-6112, 04-CV-5178, 2007 WL 4232765, at *5 (E.D.N.Y. Nov. 28, 2007) (same).[12]

As to successor liability, the general rule of corporate law is that a "purchaser of a corporation's assets does not automatically become responsible for the corporation's liabilities." *Bd. of Trs. of the Sheet, Metal Workers Local Union No. 137 v. Silverstein*, No. 92-CV-8519, 1995 WL 404873, at *2 (S.D.N.Y. July 6, 1995). "A company that purchases another['s] assets may be liable as a successor if there was substantial continuity between the enterprises." *Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 401 (S.D.N.Y. 2012) (citations and quotations omitted). The Second Circuit uses a substantial continuity test in determining whether a successor is liable for a predecessor's unpaid pension fund contributions. *See, e.g.*, *Stotter Div. of Graduate Plastics Co. v. Dist. 65, United Auto Workers*, 991 F.2d 997, 1001–03 (2d Cir. 1993) (recognizing successor's liability for predecessor's delinquent pension fund contributions where successor had notice and there was substantial continuity of business operations).[13]

---

[12] The factors to be considered in making the "integrated enterprise" determination are the "interrelationship of operations, common management, centralized control of labor relations and common ownership," as well as "the use of common office facilities and equipment and family connections between or among the various enterprises." *Lihli Fashions*, 80 F.3d at 747 (citing *Radio & Television Broad. Tech. Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam).

[13] Courts have found a successor liable where (1) it "had notice of its predecessor's obligations" and (2) a "'sufficient continuity of identity' exists between the two businesses." *Bd. of Trs. of the Sheet, Metal Workers Local Union No. 137*, 1995 WL 404873, at *2-3 (quoting *Stotter*, 991 F.2d at 1002-3 (2d Cir. 1993)); *see also La Barbera v. Sweet Hollow Mgmt. Corp.*, No. 07-CV- 123, 2008 WL 111161, at *1-2 (E.D.N.Y. Jan. 7, 2008).

The purpose of the alter ego, single employer and successor theories pled by the Fund Trustees is to make Enobrac an "in fact" signatory of the CBA, and hold Enobrac liable for the specific obligations owed to the Fund Trustees under the CBA and ERISA. The declaratory judgment, audit, and ERISA contribution claims seek relief only for the benefit of the Fund Trustees, not other creditors. Any recovery would only benefit the Fund Trustees. But to conclude that these are direct claims that only the Fund Trustees—and not a bankruptcy trustee—could raise would be incorrect.

Two Second Circuit cases are instructive. In *Madoff*, creditors (former customers) of the bankrupt Madoff estate ("Bernard L. Madoff Investment Securities LLC" or BLMIS) filed a class action against Madoff's co-conspirators alleging they had improperly withdrawn billions of dollars from BLMIS. 740 F.2d at 85. The District Court, and then the Second Circuit, addressed the question of whether that lawsuit, against non-bankrupt third parties, violated the bankruptcy court's injunction barring parties from filing derivative claims. *Id.* at 87. The creditors' artful pleading made it appear that they were stating claims unlike those of the trustee. *Id.* at 91 (noting creditors asserted conspiracy-based claims, while trustee raised fraudulent conveyance claims). However, the creditors failed to allege the defendants took particularized action against them. *Id.* at 93. Their alleged injuries were "inseparable from, and predicated upon, a legal injury to the estate." *Id.* at 92. As a result, the Second Circuit concluded that the class action claims were derivative, and not direct claims belonging exclusively to creditors. *Id.* at 98.

In *Tronox*, the Court of Appeals explained that simply because a creditor had a particular harm for which it was seeking redress did not make the claim direct:

> [E]very creditor in bankruptcy has an individual claim . . .
> against the debtor, whether it be in tort . . . , contract, or
> otherwise. . . .  Individual creditors may wish to bring claims
> against those third parties to seek compensation for harms
> done to them by the debtor and secondary harms done to
> them by third parties in wrongfully diverting assets of the
> debtor that would be used to pay the claims of the individual
> creditor.  The fact that an individual creditor may seek to do
> so does not make those secondary claims particular to the
> creditor, for it overlooks the obvious: Every creditor has a
> similar claim for the diversion of assets of the debtor's estate.
> Those claims are general—they are not tied to the harm done
> to the creditor by the debtor, but rather are based on an injury
> to the debtor's estate that creates a secondary harm to all
> creditors regardless of the nature of their underlying claim
> against the debtor.

855 F.3d at 103-4.

The Fund Trustees seek a declaratory judgment, an audit and ERISA contributions from Enobrac based on it being an alter ego and helping MJM avoid obligations.  But in so doing they do not allege that Enobrac took particularized action against them in comingling assets and operations with MJM.  The wrongdoing alleged in the Complaint—that MJM and Enobrac are "operating as the same corporate entity" (Pl's Br. at 3)—is one that affects all creditors, not just the Fund Trustees.  If MJM and Enobrac shared assets, personnel, and insurance policies, and used employees "without any meaningful distinction in their operations," (Compl. ¶ 23), and if Enobrac is merely an "iteration[] of MJM by the Carbone family to evade MJM's obligations" (Pl's Br. at 1), harm from that conduct is not specific to the Fund Trustees.  That the Fund Trustees can identify a specific harm to them from that conduct—alleged evasion of obligations under the CBA and ERISA—is to be expected.  After all, the Fund Trustees are creditors with particularized debts (evidenced by the proofs of claim filed in the two bankruptcy proceedings) they wish to have paid.  As the *Tronox* court explained, that is true for each

and every other creditor of MJM and Carbone Sr.  Nothing about the facts supporting the veil piercing theories used by the Fund Trustees would either limit the recovery from Enobrac to ERISA incurred debts or alleges harm specific to ERISA creditors.

"Congress intended to protect all creditors by making the trustee the proper person to assert claims [of the debtor]. . . .  This reasoning extends to common claims against the debtor's alter ego." *St. Paul*, 884 F.2d at 701; *Rosener v. Majestic Mgmt.*, 321 B.R. 128, 136 (Bankr. D. Del. 2005) ("[M]ost . . . courts have found that the trustee in bankruptcy has standing to bring successor liability (or alter ego) suits on behalf of all creditors.") (collecting cases).  If MJM has been hiding assets with Enobrac or using Enobrac to avoid contractual or other obligations, then Enobrac's assets may be used to satisfy obligations of all creditors.  *See, e.g.*, *Gosconcert v. Hillyer*, 158 B.R. 24, 28-29 (S.D.N.Y. 1993) (dismissing for lack of standing where individual defendant was sued under alter ego theory to enforce contractual obligations of bankrupt corporation; finding that harm suffered by plaintiff was general and "precisely that suffered by all other creditors"); *Steyhr Daimler Puch of Am. Corp. v. Pappas*, 35 B.R. 1001, 1004 (E.D. Va. 1983) ("[I]mplicit in a determination that the defendants are the alter ego of the bankrupt would be a finding that defendants have assets which are indistinguishable from those of the bankrupt or have assets that actually belong to the bankrupt.").  And there is nothing to suggest—as *Tronox* and *Madoff* require for creditor standing—that the disregard of corporate formalities or the operation of Enobrac and MJM as a single entity was uniquely related to or done for the specific purpose of avoiding ERISA obligations.

As such, the Fund Trustees' claims against Enobrac are like those other courts have found to be general.  *E.g.*, *Labarbera*, 2011 WL 1303146 at *8 (finding claim was

general and could only be raised by trustee in action seeking to hold successor corporation liable for failure to pay ERISA contributions); *In re Cabrini Med. Ctr.*, 489 B.R. 7, 9 (S.D.N.Y. 2012) (affirming bankruptcy court determination that lawsuit alleging that debtor's alter ego looted ERISA funds was general and property of the estate); *Trs. of the Const. Indus. & Laborers Health & Welfare Tr. v. Vasquez*, No. 2:09-CV-2231, 2011 WL 4549228, at *2-3 (D. Nev. Sept. 29, 2011) (although third-party defaulted, district court refused to enter a default judgment for failure to meet ERISA obligations against alter ego because creditor lacked standing and violated automatic stay); *Maney*, 1998 WL 151023, at *2 (Plaintiffs' alter ego claims constitute "injuries to [the debtor]; . . . the claims are general ones, resulting in no particularized, direct injury to plaintiffs.  In such circumstances, debts incurred under ERISA stand no different from other sorts of debts.").

"The whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets.  That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property." *Tronox*, 855 F.3d at 106 (citations omitted). If the Fund Trustees were to prevail in this litigation and obtain money from Enobrac, that would be a "a win by a single creditor, . . . [but a] win by one to the detriment of the others." *Tronox*, 855 F.3d at 104.[14]  "The exact same claim advanced by the trustee on behalf of the estate would be a win for all creditors of the estate." *Id*.  Because the Fund Trustees' claims are general, they can only be asserted by the bankruptcy trustee.

---

[14] The Trustee in the MJM bankruptcy has initiated several adversary proceedings to recover debtor property from third parties. *Supra* at 12.  The Fund Trustees' effort to recover other estate property undermines those efforts.

In the absence of standing, the Complaint must be dismissed. That dismissal must be without prejudice. *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999) ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice.") (citing *Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992)).

## II.    The Bankruptcy Stay

Even if the Fund Trustees were to establish they have standing, they still cannot proceed with the present lawsuit. They are barred from doing so by the automatic bankruptcy stay.

The filing of a voluntary petition for bankruptcy results in a stay of certain ongoing and future legal proceedings to prevent "certain creditors from pursuing their own remedies against the debtor's property." *Tronox*, 855 F.3d at 99 (quotations omitted).[15] The stay is necessary to "prevent a chaotic and uncontrolled scramble for the debtor's assets," and ensure that the "debtor's affairs will be centralized . . . in a single forum in order to prevent conflicting judgments from different courts and to harmonize all of the creditors' interest with one another." *In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir. 1992) (quotations omitted). "The stay is designed to give the debtor time to organize its affairs—which includes protection from having to defend claims brought against the estate as well as continuing to pursue judicial proceedings on its own behalf." *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 64-65 (2d Cir. 1986). The purpose the stay is also "to protect creditors[,]" *Ostando Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir. 1986) (per curiam), by avoiding a rush to the courthouse for first access to a potentially limited pool of debtor assets.

---

[15] *See* 11 U.S.C. § 362(a).

The stay is imposed by statute; it is effective automatically upon the filing of the bankruptcy petition, and no court order is required. *Colonial Realty*, 980 F.2d at 137; *Tribune Co.*, 818 F.3d at 108. The statutory framework contemplates that a court order is required only to obtain relief from the stay. *Id.* "[S]o central is the Section 362 stay to an orderly bankruptcy process that actions taken in violation of the stay are void and without effect." *Colonial Realty*, 980 F.2d at 137 (collecting cases).

"When a bankruptcy action is filed, any 'action or proceeding 'against the debtor,' is automatically stayed[.]" *Tribune Co.*, 818 F.3d at 108 (quoting Section 362(a)(1)). Actions "to recover a claim against the debtor" are also stayed. The stay extends to protect a third-party non-debtor, when the lawsuit will have "an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). "This 'adverse economic consequence' requirement . . . has been construed to include any perceptible economic harm to a non-party debtor's tangible or intangible property interest." *In re Adler*, 494 B.R. 43, 57 (Bankr. E.D.N.Y. 2013), *aff'd*, 518 B.R. 228 (E.D.N.Y. 2014). Examples of an immediate adverse economic consequence include those "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant[.]'" *Queenie*, 321 F.3d at 288 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.3d 994, 999 (4th Cir. 1986)).

The Fund Trustees have initiated this lawsuit in violation of the automatic stay, whether characterized as an action "against the debtor" or one "to recover a claim against the debtor." And although styled as a case against Enobrac, the "real party defendant" is the debtor MJM.

*First*, the Fund Trustees repeatedly and emphatically argue there is no difference between MJM and Enobrac.  (*See, e.g.*, Pl's Br. at 1 ("The Enobrac entities are merely iterations of MJM."); *id.* at 3 ("Plaintiffs learned that MJM [and Enobrac] . . . were operating as the same corporate entity.")).  As a result, Enobrac is entitled to the protection of the stay.  *See, e.g.*, *In re Adler*, 494 B.R. at 43 ("As the [d]ebtor and the alter ego [c]orporations were at all relevant times one and the same entity, the automatic stay in § 362(a)(1) foreclosed any judicial action against the [d]ebtor and [c]orporations alike[.]"); *In re Neuman*, 128 B.R. 333, 337 (S.D.N.Y. 1991) ("[I]t appears that there is such an identity between the entities as to render the state court suit in violation of the stay.").

*Second*, the alter ego remedy asserted—that Enobrac should be held responsible for MJM's obligations because it has failed to observe corporate formalities or behave like a separate corporation—makes this lawsuit subject to the stay.  That is, a veil piercing theory that the debtor has abused the corporate form and its alter ego should be held liable for the obligations of the debtor, is an action against the debtor.  *See St. Paul*, 884 F.2d at 701 (rationale of stay extends to "common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion").  It would be "illogical" to conclude such a claim was anything but one against the debtor, even though nominally against a third party.  *Id.*; *In re Hirsch*, 339 B.R. 18, 31 (E.D.N.Y. 2006) ("[A]n individual creditor asserting an alter ego claim against a third party is in essence asserting a claim 'against the debtor' within the scope of section 362(a)(1) even when the creditor seeks only to bring the alter ego's assets into the bankruptcy estate for the benefit of all creditors.") (citing *St. Paul*, 884 F.2d at 701); *see, e.g.*, *In re Adler*, 518 B.R. at 247.

That Enobrac would be protected by the stay is an inexorable conclusion of what the Fund Trustees would have to prove to establish alter ego liability. The alter ego test in ERISA cases requires analysis of "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Supra* n.11 (quoting *Goodman Piping Prods., Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir. 1984)). It is impossible to conduct that inquiry without the debtor's participation: facts about the debtor's purpose, operations and management could only be gleamed through discovery directed at the debtor. *Cf. Anderson v. Union City Mirror & Table Co., Inc. et al.*, No. 16-CV-6012, Dkt. No. 123, at *6-8 (S.D.N.Y. Jan. 25, 2018) (analyzing equipment sharing, supervision corporate purpose, office use, bank accounts, among other things, to determine whether ERISA obligations could be imposed on alter ego); *Jacobson,* 2007 WL 1774911, at *5-6 (analysis of family member roles in management, task performed by corporations, equipment sharing, and customer overlap). MJM would have to respond to discovery for the Fund Trustees to make the factual findings necessary to hold Enobrac liable under its alter ego theory. Discovery from Enobrac alone would not suffice. And if Enobrac and MJM personnel are identical, (*see* Compl. ¶¶ 14, 15), then MJM's personnel would be responding to discovery directed at Enobrac. (For example, the Fund Trustees argue that Enobrac is Carbone spelled backwards; the discovery would potentially impact the Carbone Sr. bankruptcy as well). The automatic stay exists to avoid such obligations being place on the debtor. If such discovery or litigation is necessary, it should be in the full view of the bankruptcy judge who can balance the needs of the Fund Trustees against those of the trustee and other creditors, in determining how and when the debtor's limited resources

should be expended.  The Fund Trustees' unilateral actions preclude that judgment from being exercised.[16]

    *Third*, the Fund Trustees allege not only that Enobrac is an alter ego of MJM, but also *vice versa*.  (*E.g.*, Compl. ¶ 14 ("Defendants were alter egos and successors of MJM and each other and had identical management, business purpose, operation, equipment, customers, supervision, and ownership."); *see also* Pl.'s Br. at 15 ("Plaintiffs seek contributions for work performed by Defendants as the alter egos of MJM, not work performed by MJM itself.").  If they are also asserting that MJM is also Enobrac's alter ego, the Fund Trustees are alleging that Enobrac has ERISA obligations for which MJM should be held responsible.  The Fund Trustees have simply chosen not to add MJM to the lawsuit.  Such a lawsuit, nonetheless, falls within the automatic stay.  An action claiming that debtor is the alter ego of the defendant, under which the debtor's corporate form should be disregarded, and the debtor should be held liable for the defendant's debts—even if the debtor is not in the lawsuit—is a "claim against the debtor."  *Giuliano v. Barch*, No. 16-CV-859, 2017 WL 1234042, at *15 (S.D.N.Y. Mar. 31, 2017) ("[P]iercing the corporate veil assumes that the corporation itself is liable for the obligation sought to be imposed, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation[.]").  Section 362(a)(1) bars both an "action against the debtor" and "to recover a claim against the debtor."  This "latter category must encompass cases in which the debtor is

---

    [16] In light of what is required to prove successor and single employer theories, *supra* at 21-22, these other two remedies would create the same discovery burdens as the alter ego remedy.

not a defendant; it would otherwise be totally duplicative of the former category and pure surplusage." *Colonial Realty*, 980 F.2d at 131.

*    *    *    *

This lawsuit is a poorly disguised effort to avoid the bankruptcy stay. The Fund Trustees point out the existence of the bankruptcy stay and its application to MJM. (*See* Pl's Br. at 19). Yet at the same time they offer no explanation—despite the drumbeat of allegations about the identity between MJM and Enobrac—why they have permission to file the lawsuit. Had the bankruptcy court determined that the stay did not apply to Enobrac, then the Fund Trustees could have proceeded with this lawsuit. Had the bankruptcy court concluded the stay did apply, the Fund Trustees could have sought relief from it. But the failure to go to the bankruptcy court at all is troubling, particularly when the Fund Trustees admit the bankruptcy court would be unlikely to grant stay relief. (Pl.'s Br. at 19 ("[I]t is highly doubtful that the [bankruptcy] court would consider Plaintiffs' claims sufficiently compelling to lift the automatic stay in this particular instance.")). If the bankruptcy court is unlikely to lift the automatic stay for these ERISA obligations, the Fund Trustees should not have filed this lawsuit against the debtor's alter ego.

Simply put, the Fund Trustees—who also filed proofs of claims in the bankruptcy court in two separate cases and were aware of the stay—should have gone to the bankruptcy court first before filing this lawsuit. This is not a question of preferring one forum over another; it is the command of the bankruptcy code. There are serious consequences for filing suits in violation of the automatic stay. *See* 11 U.S.C. § 362(k);

*In re Chateaugay*, 920 F.2d 183, 186-87 (2d Cir. 1990).[17]  And rightly so: forcing the debtor to expend resources in non-bankruptcy approved litigation, even just for legal fees incurred in defense, diminishes the available resources available to satisfy obligations to all creditors.  A party may not just "engage in self-help in derogation of the automatic stay," as the Fund Trustees have done.  *In re Fugazy Express, Inc.*, 982 F.2d 769, 776 (2d Cir. 1992).

It is no defense to say that by suing a third party, the Fund Trustees believed they had no obligation to approach the Bankruptcy Court.  To argue that Defendants "were alter egos and successors of [the debtor], (Compl. ¶ 14), mere iterations of each other, "the same corporate entity," (Pl.'s Br. at 3), only "nominal[ly] separated," (Compl. ¶ 15), and a "single integrated enterprise," (*id.*), while proceeding to list nearly a dozen means in which they should be considered identical, (*id.* at ¶¶ 19-27), is to say that the lawsuit is against the debtor, not a true third party.[18]  Perhaps the Bankruptcy Court would,

---

[17] Sanctions may be imposed against the Fund Trustees for violating the stay against Carbone Sr.; the Fund Trustees may be held in contempt for violating the stay against MJM.  *See Chateaugay Corp.*, 920 F.2d at 186 (holding that "a bankruptcy court may impose sanctions pursuant to § 362[k] . . . only for violating a stay as to debtors who are natural persons.  For other debtors, contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay.").  The sanctions provision was originally designated as § 362(h), and was redesignated as § 362(k)(1) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, § 305, 119 Stat. 23 (2005).

[18] Judge Cogan declined to dismiss an ERISA lawsuit against a third party alter ego, even though the employer directly responsible for making contributions was protected by a bankruptcy stay.  *See Pavers & Rd. Builders Dist. Council Welfare Fund v. Core Contracting of N.Y., LLC*, 536 B.R. 48, 53 (E.D.N.Y. 2015).  However, the complaint was "not limited to or even dependent upon those [alter ego] allegations" and "the non-debtor defendants [had] independent contractual liability under the various association and individual collective bargaining agreements."  *Id.*  In contrast, the veil piercing theories of the Fund Trustees are the basis of the claims against Enobrac, and are incorporated via reference into each cause of action.

after requiring certain facts to be ascertained, come to a different final conclusion, but that was not the Fund Trustees' decision to make unilaterally.

There is another aspect to the gamesmanship of the Fund Trustees' position: arguing that they are not enforcing the 2015 Settlement with MJM. This lawsuit appears to do exactly that, and as a result, is also barred by the automatic stay. Section 362(a)(6) precludes "any act to collect, assess, or recover a claim against a debtor that arose" before MJM's bankruptcy filing, *i.e.* any pre-petition debt. *In re Radcliffe*, 390 B.R. 881, 889 (N.D. Ind. 2008), *aff'd*, 563 F.3d 627 (7th Cir. 2009) ("The stay 'prevents *all* pre-petition creditors from taking *any* action to collect their debts.'") (emphasis in original) (quoting *In re Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990)); *In re Silver*, 303 B.R. 849, 864 (B.A.P. 10th Cir. 2004) (affirming bankruptcy court's voiding of liens filed by IRS against non-debtors to collect the same debt claimed in IRS's pre-petition claims filed against the debtor as violative of § 362(a)(6), *supplemented*, 305 B.R. 381. Attempting to enforce a debtor's ERISA obligations—after they have been reduced to a contractual agreement to pay—violates the automatic stay. *See, e.g.*, *Radcliffe*, 390 B.R. at 891-92 (attempt to collect ERISA payments from debtor who had agreed to pay company's delinquent contributions violated 362(a)(6)).[19]

Judge Hurley signed a Consent Judgment on October 5, 2015. The Judgment included all amounts MJM owed to that point to the Fund Trustees. In other words, MJM's ERISA obligations prior to October 2015 were reduced to a monetary judgment of $819,163.02. A little more than a year later, on November 1, 2016, MJM filed for Chapter 11 protection. MJM listed the 2015 Settlement in its schedule of pre-petition

---

[19] That the attempt to collect comes via lawsuit is of no moment. Section 362(a)(6) prohibits "any act" to collect a debt.

debts and contractual obligations.  (*In re MJM Plumbing of NY, Inc.*, 16-44924, Dkt. No. 1, Form 204 at 2).  The Complaint does not limit the relief sought against Enobrac to the obligations incurred between October 2015 and November 2016; if it did, the Fund Trustees could credibly argue that they were not seeking the amounts subject to the 2015 Settlement.  The Complaint, however, seeks to impose on Enobrac MJM's obligations going as far back as May 2011.  (*See* Compl. ¶ 46 ("Delinquent Contributions") (Enobrac and MJM are "jointly and severally liable to the funds for delinquent contributions for the period May 2011 through the present.").

The Complaint makes no mention of the 2015 Settlement and judgment entered against MJM; when confronted with it by Enobrac, the Fund Trustees engage in semantics.  In its motion to dismiss, Enobrac argued that "these same Funds have brought, and settled, actions in this Court against MJM for the very same alleged delinquent contributions at issue in this action."  (Enobrac Br. at 3).  In response the Fund Trustees said that "no portion of the relief requested in this action may be attributed to amounts already resolved through Plaintiffs prior settlements with MJM," and that they do not "seek double or multiple payment of the amounts covered by the prior settlement agreements, but merely . . . to hold [Enobrac] liable for MJM's obligations to Plaintiffs."  (Pl's Br. at 14-15).  They also argued "[the Fund Trustees] seek contributions for work performed by Defendants as the alter egos of MJM, not work performed by MJM itself."  (*Id.* at 15).

In other words, the Fund Trustees take the position that they are not seeking to enforce the settlement, but are seeking to enforce an entirely independent legal obligation on Enobrac, one that has nothing to do with the prior lawsuits, or the 2015 Settlement.  This is sophistry.

The arguments made in opposition to the motion to dismiss—that the 2015 Settlement with MJM is irrelevant—are inconsistent with the Complaint. As noted earlier, given the time frame of the recovery sought, it is impossible that the 2015 Settlement is not the basis of the derivative recovery sought against Enobrac. The entirety of the deficient pre-October 2015 ERISA contributions are covered by the 2015 Settlement. There are no other pre-2015 obligations that this lawsuit is deigning to recover. Moreover, there is no allegation in the Complaint that Enobrac was subject to a different CBA or that the ERISA obligations were incurred as a result of work done for Enobrac, but had nothing to do with MJM. Quite the opposite—all of the claims against Enobrac are derivative of MJM's obligations. (*E.g.,* Compl. ¶ 27 (Enobrac "created . . . specifically for the purpose of . . . *the avoidance of MJM's obligations to [the Fund Trustees] under the CBA*.") (emphasis added). The 2015 Settlement related to a CBA between the Union and MJM (14-CV-6342 Compl. ¶¶ 13; 14-CV-6342, Dkt. No. 6 at 1); and that CBA appears to be the basis of the obligation the Fund Trustees are trying to impose on Enobrac. (Compl. ¶¶ 10-11 ("[T]he CBA also required MJM to remit . . . to the Welfare Fund."); ¶¶ 36-37 (CBA requires MJM to submit to payroll audits). And to argue that Plaintiffs "merely seek[] to hold [Enobrac] liable for MJM's obligations" (Pl. Br. at 14) is an attempt to enforce the settlement; MJM's only ERISA "obligation" prior to 2015 is the Settlement.

Furthermore, the settlement provides in no uncertain terms that it binds "successors" of MJM. (No. 14-CV-6342, Dkt. No. 6 at 4). Plaintiffs allege Enobrac is such a successor. Judge Hurley reserved jurisdiction to enforce the terms of the 2015 Settlement. That is never mentioned by the Fund Trustees.

At a minimum, because the Fund Trustees are relying on MJM's obligations to sue Enobrac, they should have honestly brought the 2015 Settlement to this Court's attention (or Judge Hurley's), and addressed its implications.  When confronted, the Fund Trustees try to argue the lawsuit has nothing to do with the settlement.  It is impossible to see how that contention is not frivolous, in light of what the Fund Trustees simultaneously allege in the Complaint, the time frame of the Complaint, and the fact the settlement binds successor entities.  It appears that the only reason to make such arguments is to avoid the bankruptcy stay, and to avoid having to go to Bankruptcy Court to seek permission to initiate this lawsuit.  Upon MJM's bankruptcy, the Fund Trustees were no longer free to take any action to collect the 2015 Settlement.  *E.g.*, *In re Baptist Medical Center, Inc.*, 52 B.R. 417, 418 (E.D.N.Y. 1985) (Glasser, J.) (affirming bankruptcy court's decision to impose liability for failure to pay ERISA contributions while staying entry of judgment because of automatic stay; bankruptcy court concluded that doing otherwise would result in preferential treatment of fund trustees over other creditors), *aff'd* 781 F.2d 973, 973 (2d Cir. 1986) (per curiam).  The fact that the Fund Trustees sued Enobrac, as opposed to MJM directly, does not mean there has not been a stay violation.  As explained earlier, the stay can protect non-debtors, and section 362(a)(6) has been extended in that fashion.  *E.g.*, *Bihari v. DDJ Capital Mgmt., LLC*, 306 B.R. 336, 338 (E.D. Cal. 2004) (finding stay violation when plaintiff sued non-bankrupt officers and directors in attempt to recover unpaid wages); *In re King*, 396 B.R. 242, 245 (Bankr. D. Mass. 2008) (denying motion to dismiss lawsuit alleging that IRS violated § 362(a)(6) in filing lien against both debtor and non-debtor individuals).

Again, the Fund Trustees are choosing to unilaterally make decisions that are properly within the provenance of the bankruptcy court, hoping this Court would not

notice.  The Court is troubled by this conduct.  This is no minor issue—the "automatic stay is . . . integral to the very operation of the bankruptcy laws"—and the Fund Trustees' actions, even if the present lawsuit is dismissed, undermine the bankruptcy court's efforts to ensure an orderly liquidation of MJM and interfere with Carbone Sr.'s bankruptcy.  *Divane v. A&C Elec. Co.*, 193 B.R. 856, 861 (N.D. Ill. 1996).

The lawsuit is *void* because for the reasons explained, it was filed in violation of the bankruptcy stay.  *Colonial Realty*, 980 F.2d at 137.

III.   Duplicative Litigation

In the alternative, this Court also respectfully recommends that the lawsuit be dismissed pursuant to the Court's inherent authority to dismiss duplicative litigation.

The Fund Trustees filed proofs of claim in the MJM bankruptcy; those claims are being considered by the bankruptcy court.  Those claims were filed on May 22, 2017, just days after this Complaint was filed.  The Fund Trustees also filed proofs of claim in the Carbone Sr. bankruptcy.  The claims were filed on March 18, 2017, almost two months before this Complaint was filed; the Fund Trustees were actively litigating their claims before the bankruptcy court before choosing to file this action.

The Fund Trustees are litigating in two fora—and in three cases—simultaneously. If Enobrac is one and the same as MJM, the Fund Trustees are pursuing amounts here that they are also seeking through the claims process.  The Fund Trustees have not taken the position that they are limiting their recovery here to that which they could not recover via the claims process.  (They only make the specious argument that they are not seeking to enforce indirectly the 2015 Settlement Agreement).  Indeed, they never brought the fact they had filed proofs of claim to the Court's attention.  There is, as a

result, the risk that the amounts recovered here would be the same awarded to the Fund Trustees in the bankruptcy process.

Even if double recovery were not an issue, the same issues are to be litigated in two courts and three actions.  The basis for claims in MJM's bankruptcy are "contributions to employee benefit plans pursuant to [the] CBA."  (See 16-44924, Claim 14-1 at 2; Claim 16-1, at 1).  The Complaint is predicated on the same CBA or contracts, seeking to recover from Enobrac (under the third claim for "delinquent contributions") contributions for the same work performed, during the same period by the debtor.  That one case involves the debtor and the second its alter ego only heightens the risks from proceeding simultaneously.  Were the bankruptcy court to interpret the CBA or ERISA differently, or come to a different view of the facts, Enobrac could be found liable for contributions where MJM is not.  Additional and unnecessary complication is created through the Carbone Sr. bankruptcy, where the proposed reorganization plan attempts to resolve the obligations that are also the subject of this action against Enobrac.

Both MJM and Carbone Sr.'s bankruptcy petitions were filed before the Complaint was filed.  The Carbone Sr. proofs of claim were filed before the Complaint, and the MJM claims were filed only shortly afterwards.  The Bankruptcy Court should be permitted to resolve those claims without the debtor (and its co-extensive alter ego) facing potentially duplicative or inconsistent obligations and from another forum.

Timing is also a relevant consideration.  Were one of the bankruptcy cases to proceed slower than this case, there is the risk that the present litigation would indirectly give preference to the Fund Trustees' claims over those of other creditors.  "[N]o creditor should be given the opportunity to liquidate his claim on his schedule in his chosen forum, while other creditors are denied that strategic advantage. . . .  [I]t

would be particularly inappropriate to grant such preferential leverage to one creditor simply because he got closer to judgment before bankruptcy intervened, because such a policy would encourage a rush to the courthouse that has always been recognized as contrary to sound bankruptcy policy[.]" *In re Patel*, 291 B.R. 169, 174–75 (Bankr. D. Ariz. 2003).

Furthermore, potentially significant bankruptcy processes are implicated through the claims process and this Court should not, by permitting this case to continue, undermine them.  The Fund Trustees are creditors.  "It is well settled that by filing a proof of claim, a creditor submits to the bankruptcy court's equitable jurisdiction regarding adjudication of matters related to that claim[.]" *Sec. Investor Prot. Corp. v. Madoff,* 443 B.R. 295, 310 (Bankr. S.D.N.Y. Feb. 9, 2011) (collecting cases).  And "[w]hen a creditor submits to bankruptcy court jurisdiction by filing a proof of claim in order to collect all or a portion of a debt, it assumes certain risks.  For example, the creditor loses the right to a jury trial on any counter-claims filed by the debtor or the trustee.  In addition, the creditor loses previously-held rights to assert 'legal claims' against the debtor and his estate; bankruptcy 'converts the creditor's legal claim into an equitable claim to a pro rata share of the res.'" *In re Simon*, 153 F.3d 991, 997 (9th Cir. 1998) (quoting *Katchen v. Landy,* 382 U.S. 467, 336 (1966)).

It is unnecessary to explore the full contours of how the bankruptcy court's equitable jurisdiction over a creditor's claim is affected by a lawsuit in which the same creditor simultaneously litigates issues implicated by the claim.[20]  But it is wise to let the claims process proceed to conclusion and avoid duplication and other complications.

---

[20] The *Patel* court identified other potential issues initiated by a claim, and consequently denied the request to lift a bankruptcy stay to pursue litigation.  "The . . .

When duplicative litigation is brought to the attention of the bankruptcy court, it has the option of enjoining the non-bankruptcy litigation, pursuant to 11 U.S.C. § 105(a), and preventing third parties from prosecuting their related case.  In *In re Brentano's, Inc.*, for instance, the debtor entered into a lease agreement; a third party had guaranteed the rent payments.  27 B.R. 90, 91 (Bankr. S.D.N.Y. 1983).  The debtor had in turn, agreed to indemnify the third party for liability that arose out of the guarantee.  *Id.*  The lessor, after the debtor filed a Chapter 11 bankruptcy petition, filed a proof of claim in the bankruptcy; but it subsequently sued the guarantor for the deficient lease payments in California state court.  *Id.*  Because the issues in the state proceeding necessarily impacted the bankruptcy case, including the claims process, the bankruptcy court enjoined the state litigation.  The court explained:

> Only this Court has a global view of the [debtor's] case and reorganization efforts.  Disposition of the largest unsecured claims in this forum will facilitate [the debtor's] efforts to formulate a plan of reorganization. . . .  Multiple and haphazard state court litigations will delay and deter ultimate resolution of the bankruptcy case.  This comment is not a criticism of state court proceedings; however, each forum has a restricted view of the factors and parties involved.  This Court has an overall view of the [debtor's] case and all aspects of that case should be before this Court, particularly actions that may determine whether reorganization efforts succeed.

*Id.* at 92.  Those same considerations counsel and permit a district court to dismiss litigation in favor of the bankruptcy court process.

---

claim may be subject to some unique bankruptcy defenses such as subordination pursuant to §§ 510(b) or (c) or disallowance pursuant to §§ 502(b)(2), (4) or (5).  The claim may need to be estimated pursuant to § 502(c).  Or the claims may be so complex that they are better resolved by a unique bankruptcy remedy such as substantive consolidation."  291 B.R. at 174.

For example, in *Bernheim v. Elia*, the debtor corporation, D.A. Elia, was in Chapter 11 reorganization, and a shareholder sued several persons and entities involved in the ownership and operation of the debtor (though not the debtor itself).  No. 06-0855, 2007 WL 1858246, at *1 (2d Cir. June 28, 2007).  The plaintiff shareholder alleged he was entitled to funds allegedly misappropriated by the defendants.  The plaintiff had also, prior to initiating the lawsuit, filed a proof of claim in the bankruptcy case.  *Id*.  The District Court dismissed the lawsuit without prejudice; as a shareholder, the plaintiff's recovery in the litigation was dependent on events in the bankruptcy court—including its determination on how much money was left in the estate to pay to shareholders.  No. 05-CV-0118, 2006 U.S. Dist. Lexis 96504, at *5 (W.D.N.Y. Jan. 9, 2006).  The Second Circuit, although reversing on other grounds, found that the "in light of 'the necessity of avoiding duplicative litigations, thereby conserving judicial resources, [the District Judge] . . . acted well within his discretion when he dismissed" the plaintiff's lawsuit in favor of the bankruptcy court.  2007 WL 1858246, at *1 (quoting *First City Nat. Bank & Tr. Co. v. Simmons,* 878 F.2d 76, 80 (2d Cir. 1989)).

Similarly, in *In re Baldwin-United Corp. Litig.*, the defendant in a consolidated securities class action, Paine Webber, filed a proof of claim in bankruptcy court asserting claims of indemnity and contribution against the debtor.  765 F.2d 343, 344 (2d Cir. 1985).  Paine Webber also filed a third-party complaint against the debtor in the securities class action, which was in the District Court.  *Id*.  Paine Webber obtained from the District Court an injunction preventing the debtor from seeking relief from the bankruptcy court, on the grounds that its third-party complaint was not subject to the automatic stay.  *Id.*  The Second Circuit reversed.  *Id.* at 348-49.  It ruled that the bankruptcy court should have been permitted, in the first instance, to determine

whether the third-party complaint was subject to the automatic stay. *Id.* Removing the bankruptcy court's power to grant relief to the debtor made it more likely that there would be other district courts defining the scope of the stay and creating conflicting decisions. *Id.* at 349. Relevant to the present case, the Second Circuit also deferred to the bankruptcy court based on the rule of priority. It held that given Paine Webber's proof of claim being filed first in bankruptcy court, "[t]he normal priority to be accorded the court in which proceedings are first initiated, ought to be followed . . . at least to the extent of permitting the Bankruptcy Court to give initial consideration to the proof of claim[.]" *Id.* (citing *Meeropol v. Nizer*, 505 F.2d 232, 235 (2d Cir. 1974).[21]

Dismissal, as the Second Circuit approved in *Bernheim*, would be appropriate here. The "bankruptcy proceeding itself calls into play important considerations about the equal treatment of creditors that would be frustrated by continuation of the district court action." *St. Paul*, 884 F.2d at 707. The Fund Trustees filed proofs of claim in the Carbone Sr. bankruptcy prior to initiating this lawsuit; both bankruptcy petitions were filed before the Complaint. The claims in both cases implicate the same recovery sought in this case and are based upon the same CBA and many of the same facts that would be gleamed from this litigation. Permitting the bankruptcy court, and not the district court, to adjudicate these issues is the more prudent course.

---

[21] The bankruptcy court cannot ensure equal treatment of creditors if creditors initiate their own multi-fora litigation outside of the reorganization or liquidation; that is particularly true where the bankruptcy court is not even made aware of the present litigation. The importance of letting the bankruptcy process run its course is sufficiently compelling that the Second Circuit has suggested that a bankruptcy case filed *after* a district court litigation has begun takes precedence—even though doing so would run counter to the general rule that the first filed action be given priority. *St. Paul*, 884 F.2d at 706.

It is true that this action is against Enobrac.  That does not matter.  "'[T]he general rule is that a suit is duplicative of another suit if the parties['] issues and available relief do not significantly differ between the two actions.'" *Pacheco v. Home Am.*, Nos. 6:11-CV-0965, 6:11-CV-1195, 2012 WL 254474, at *6 (N.D.N.Y. Jan. 27, 2012) (quoting *I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1551 (11th Cir. 1986)). The doctrine against duplicative litigation has been invoked in the precise circumstances here: where there is not complete identity between the debtor and the defendants in the civil litigation, but the plaintiff-creditor is the same, and the underlying issues have significant, if not complete, overlap.  *See Bernheim*, 2007 WL 1858246, at *1; *cf. In re Brentano's*, 27 B.R. at 91.

If standing and the bankruptcy stay are not appropriate bases on which to dismiss this case, the Court should rely on its inherent authority to dismiss this duplicative litigation.[22]

## Conclusion

For the reasons stated above, it is respectfully recommended that the Complaint be dismissed for lack of standing; or in the alternative, be declared void because it violates the bankruptcy stay, or dismissed as duplicative of ongoing bankruptcy proceedings; Enobrac's motion to dismiss be denied as moot; and this Report and Recommendation and the final opinion of the District Court be forwarded to the bankruptcy court.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections

---

[22] Such a dismissal would also be without prejudice.  *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).

within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

s/ Sanket J. Bulsara
_____
Sanket J. Bulsara
United States Magistrate Judge

Brooklyn, New York
February 12, 2018